IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| RONALD GRUNER, individually, and as Representative of the former Stockholders of Sky Analytics, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> HURON CONSULTING GROUP, INC., a Delaware corporation and CONSILIO, Inc., a Delaware corporation, <br><br> Defendants. | Case No. 18-CV-2143 |

## COMPLAINT

Now comes Plaintiff RONALD GRUNER ("Gruner"), individually and as representative of the former shareholders of Sky Analytics, Inc. ("Sky"), by and through his counsel, as and for his Complaint against Defendants HURON CONSULTING GROUP, INC. ("Huron") and CONSILIO, INC. ("Consilio") states as follows:

### Nature of the Case

1. This case arises out of Huron's purchase of 100 percent of the outstanding shares of Sky pursuant to a Stock Purchase Agreement dated as of December 30, 2014 ("Purchase Agreement").

2. In addition to the purchase price for the Sky shares, a significant amount was to be paid pursuant to earn-out provisions in the Purchase Agreement. The earn-out payments would be made if certain revenue thresholds were met by Huron after the Sky acquisition.

3. Prior to the acquisition, Huron repeatedly assured Gruner and the other Sky shareholders (collectively, the "Former Shareholders") that it was excited about acquiring Sky and

1

that it would put adequate resources toward selling the Sky product, which would be necessary to reach the revenue thresholds and make the earn-out payments.

4. In connection with the share purchase and the negotiations leading up to that purchase, however, Huron made numerous fraudulent misrepresentations to the Former Shareholders and omitted numerous material facts.

5. These misrepresentations and omissions included, among other things, (a) its communication of false projections regarding future Sky revenues to the Former Shareholders, (b) its failure to disclose Huron's inability to sell Sky deals, (c) the fact that Huron Legal Services division's ("Huron Legal") own operations and finances were in significant decline, thus harming its ability to sell Sky's product and meet the earnout thresholds, and (d) Huron's desire to allow Gruner to remain involved with Sky as a subcontractor to help support the Sky business.

6. Huron knowingly and deliberately made the misrepresentations and omissions as part of a scheme and plan to induce the Former Shareholders to agree to the purchase price and future earn-out provisions.

7. Had the Former Shareholders known the truth regarding these material misrepresentations and omissions, they would never have agreed to the Purchase Agreement or earn-out provisions.

8. Accordingly, Gruner brings this action pursuant to the anti-fraud provisions of the Illinois Securities Law ("ISL"), 815 ILCS 5/12(F), (G) and (I), and for common law fraud.

## Parties

9. Plaintiff Gruner is an individual who resides in Naples, Florida and who is a citizen of Florida. Gruner co-founded Sky and, before the purchase of its shares by Huron, served as Chairman and CEO of Sky. Gruner also owned a significant portion of the outstanding shares of Sky at the time of their purchase by Huron. Pursuant to § 12.12 of the Purchase Agreement, the

Former Shareholders appointed Gruner as their Representative with power to "represent the Stockholders and their respective successors with respect to all matters arising under this Agreement and the Ancillary Agreements."

10. Prior to starting Sky, Gruner successfully started other companies, including Shareholder.com. In the summer of 2004, Gruner negotiated a marketing partnership between Shareholder.com and NASDAQ, which was very successful for both firms. As a result, NASDAQ made an offer to acquire Shareholder.com in November 2005 for approximately $43 million, a deal that closed in January 2006 ("NASDAQ deal"). The acquisition was highly successful for NASDAQ, with Shareholder.com's revenues growing from approximately $13 million in 2005 to $80 million by 2010. The success of the NASDAQ deal was, in large part, due to NASDAQ management's willingness to allow Shareholder.com's management nearly full autonomy in managing the Shareholder.com business post-acquisition.

11. Defendant Huron is a Delaware corporation, with its principal place of business located in Chicago, Illinois.

12. Defendant Consilio is a Delaware corporation, with principal places of business in Delaware, and upon information and belief, the District of Columbia.

## Jurisdiction and Venue

13. The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because, as alleged above, there exists complete diversity of citizenship between the parties. For diversity purposes, Defendant Huron is a citizen of Illinois and Delaware and Defendant Consilio is a citizen of Delaware and the District of Columbia. Gruner is a citizen of Florida.

14. The matter in controversy in this action exceeds the sum or value of $75,000 exclusive of interest and costs.

15. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because the defendant resides in this district, has its registered office in this district, and a substantial part of the events giving rise to the claim occurred in this district.

## Background

16. In or around March 2014, Huron and Sky entered into negotiations for Huron to purchase the shares of Sky.

17. At the time, Huron was one of several interested firms with whom Sky was discussing a merger, partnership, or sale of Sky. Included in the deals being seriously discussed with the executive management of the other firms were structures similar to the structure of the highly successful NASDAQ deal.

18. As part of negotiating the Huron purchase of Sky, the parties agreed it would have two components: (i) an immediate cash payment, and (ii) earn-out payments (the "Earn-Out").

19. Early in the negotiations, Dawn Bartholomew, Vice President of Corporate Development for Huron, sent a non-binding Letter of Intent ("LOI") dated June 4, 2014 to Gruner for review, which contained numerous projections relating to Huron's ability to meet the Earn-Out by achieving certain revenue thresholds. Gruner and the Former Shareholders did not and do not have access to the models and formulas used by Huron and its agents to arrive at the projections it presented—those facts are in Huron's exclusive possession, custody, and control.

20. Bartholomew pitched the projections to Gruner as *conservative*, stating in her cover email,

> Additionally, as the earn-out is revenue based starting in CY 2015, I've attached the [sic] a **low risk assumption** we've made around selling your tool into our top 20 clients through Huron Legal's sales organization. (For perspective, we pulled a list of the companies Huron Legal has sold services to over the last 3 years and it surpassed 600 potential clients). Huron has a long history of maximizing earn-outs for its acquisitions and feel confident Sky Analytics would be no different. (emphasis added)

21. Upon information and belief, including information reflected on publicly filed annual reports after the Huron-Sky transaction closed, Huron has documentation in its exclusive possession and control, which demonstrates that the revenue projections in the June 4, 2014 LOI were not conservative, but rather, very aggressive.

22. After further negotiations, on or around July 14, 2014, Huron sent Sky a revised LOI outlining the anticipated terms of Huron's purchase of the Sky shares, including revised projections relating to revenue thresholds needed to achieve the Earn-Out. Under the July 14, 2014 LOI, the purchase of Sky had two components: (i) a $9 million cash payment, and (ii) an Earn-Out worth up to $3 million. That same day, Gruner signed the LOI on behalf of Sky.

23. Under the LOI, the Earn-Out would be paid out to Sky shareholders over 2015 and 2016 such that each dollar of revenue above a certain "Revenue Threshold" ($2.5 million in 2015 and $4.0 million in 2016) would be paid to the Sky shareholders, up to a total Earn-Out payment of $3 million.

24. The revenue factored into the Earn-Out calculation included (i) the subscription fees of existing Sky customers; (ii) the subscription fees or certain minimum amounts for each new Sky customer; and (iii) a portion of revenue generated by Huron Legal out of or from implementing Sky's business.

25. The value of the Earn-Out thus would depend on Huron's ability and commitment after the closing of the Purchase Agreement to add new customers for Sky, as well as the stability or growth of Huron Legal's revenue, which both directly affected the Earn-Out and indirectly affected the Earn-Out through the adoption of Sky by such customers.

26. In addition, based on his experience and success in the NASDAQ deal, Gruner negotiated with Huron to add a provision to the LOI to help assure Sky's success inside Huron.

Specifically, the LOI provided, "Ron Gruner agrees to provide advisory services for a 2 year period for no compensation as part of the transition arrangement." This consulting arrangement was later formalized as a statement of work and sub-contractor agreement, although the final agreement provided for a monthly fee to be paid to Gruner. Throughout Sky's negotiations with Huron, Huron continued to lead Gruner to believe he would continue to play a role with respect to Sky after the Huron acquisition.

27. On or around August 14, 2014, Huron and Sky held an operational planning meeting focused on selling Sky into Huron's client base. Huron, through, among others, Bartholomew and Bob Rowe, Huron Legal's Managing Director, presented Gruner and Sky with an evaluation of the Earn-Out based on projected sales of four small and two large Sky service contracts per month by its internal sales teams.

28. Huron did not disclose to Gruner and Sky all of the details and assumptions underlying its projections. Upon information and belief, including information reflected on publicly filed annual reports after the Huron-Sky transaction closed, Huron has documentation in its exclusive possession and control, which demonstrates that it knew at the time of the operational planning meeting, that the projected monthly new client additions and sales figures provided to Sky were extremely aggressive.

29. Huron never informed Gruner or Sky that the projections presented at the August 14, 2014 operational planning meeting represented an extremely aggressive revenue scenario from which the Earn-Out would be calculated.

30. As the fourth quarter of 2014 continued and the parties continued negotiations, unbeknownst to Sky, the financial performance of Huron Legal itself proved much weaker than previous quarters, as reported in documents that were publicly filed after the closing of Huron's

purchase of Sky. In fact, Huron Legal's revenues had fallen almost 50%, from $55.0 million in the first quarter 2014 to only $28.6 million in the fourth quarter.

31. These facts, which would have shown that Huron Legal's own business was collapsing, were never communicated to Sky prior to the closing of Huron's purchase of Sky's stock, despite the fact that Huron knew its ability to reach the Revenue Thresholds and thus, make the Earn-Out payments, depended almost entirely on its ability to devote resources, including its own internal sales team, to sell the Sky product.

32. As the acquisition negotiations were concluding, on December 24, 2014, Gruner emailed Bartholomew and Bob Rowe to once again confirm that the parties had three mutual objectives, one of which was "[l]et's assure Huron Legal executive team's objectives are aligned with Sky's earn-out objectives. If Sky needs cumulative revenues of $7 million, for example, over the next two years to meet its earn-out, Huron Legal's team should have the same objectives."

33. Rowe responded to Gruner the same day, confirming, "[w]e believe we can transform the legal industry collectively as a team. My leadership Team and I are committed at all times to making sure we have the tightest alignment possible for every objective we pursue."

34. Thus, Huron chose not to inform Gruner and Sky of Huron Legal's deteriorating business and decreasing revenues, instead staying silent, all the while knowing that disclosure of its poor financial performance would lead Gruner and Sky not to move forward with the acquisition for fear of Huron Legal not being able to commit the resources to achieve the revenue necessary to reach the Revenue Thresholds and thus, pay the Earn-Out payments.

35. Operating under false pretenses created by Huron's misrepresentations and omissions, Gruner and Sky agreed to a stock purchase by which Huron acquired all of Sky's stock pursuant to the Purchase Agreement. The deal closed on January 8, 2015.

36. Pursuant to the Purchase Agreement, Huron acquired Sky for $9 million, plus two Earn-Out amounts.

37. As had been contemplated in the LOI, pursuant to the Purchase Agreement, the Earn-Out amounts would be paid out to the Former Shareholders over 2015 and 2016 such that each dollar of revenue above a certain "Revenue Threshold" ($2.5 million for the period beginning April 1, 2015 and $4.0 million for the period beginning April 1, 2016) would be paid to the Former Shareholders, up to a total Earn-Out payment of $3 million.

38. In addition, in connection with the closing of the acquisition, Huron and Gruner signed a Master Subcontractor Agreement and Statement of Work ("Subcontractor Agreement") dated January 6, 2015 for Gruner to provide a variety of post-acquisition services. These services included: "drive roadmap creation ... of product strategies; work closely with sales and marketing on pricing, bundling, and positioning to assure a cohesive strategy; develop talent and enhance the discipline of strategic planning; and provide all necessary support to help market, sell and develop Sky Analytics products." Gruner was never engaged to perform these services despite his requests to do so.

39. Unbeknownst to Gruner, Rowe never intended to allow Gruner to perform services under the Subcontractor Agreement, despite Rowe's knowledge that Gruner belief that he would play a role after the acquisition was a material inducement to him signing the Purchase Agreement, Subcontractor Agreement and the LOI. To further induce Gruner to sign the LOI, Rowe inserted a handwritten provision into a July 8, 2014 version of the LOI, which stated that Gruner would play an advisory role for two years. That provision remained in the July 14, 2014 version of the LOI, which Gruner executed.

40. After the acquisition of Sky closed, Huron Legal and its sales team did not focus on selling Sky deals and made little effort to achieve the Revenue Thresholds necessary to meet the Earn Out.

41. Huron never told the Former Shareholders that it was not going to focus on and devote adequate resources to selling Sky deals. The Former Shareholders never would have sold the business had they known that information.

42. The Huron sales team's lack of focus on selling Sky deals showed—it only delivered $312,296 in Sky-related revenue during the first Earn-Out calculation period, less than 20 percent of its projected amount. In stark contrast, the Sky sales team (which continued to sell Sky's product after the acquisition), secured $1,789,617 in revenue, exceeding its objective by more than 13 percent. With such poor efforts by Huron caused by Huron Legal's lack of resources and commitment, which were never disclosed to Sky either before or after the acquisition, the Revenue Threshold needed to make a first Earn-Out payment was not met.

43. In addition, despite Gruner's efforts to become involved, Huron never allowed Gruner, with all his entrepreneurial success, management skills and enthusiasm for the business, the promised ongoing participation in developing the Sky business, further damaging the ability of Huron to meet the Revenue Thresholds.

44. It was not until Huron released its year-end 2014 financial results officially through the public filing of its Form 10-K on February 24, 2015 that Gruner and the Former Shareholders first became aware of Huron Legal's financial troubles. The Form 10-K revealed that Huron Legal had significantly underperformed in the fourth quarter of 2014—reporting that fourth quarter revenues were "significantly lower than each of the first three quarters of 2014" and that its fair value as a division of Huron as compared to its carrying value had significantly decreased. The

Form 10-K also revealed that, to try to stop Huron Legal's significantly worsening financial condition, "Huron Legal's segment leadership is currently executing several initiatives to improve the segment's financial performance and increase sales of their service offerings."

45. Ultimately, Huron sold Huron Legal, including the Sky Business, to Consilio in exchange for net proceeds of $110.1 million, a deal that closed in December 2015, less than a year after Huron acquired Sky ("Consilio Purchase"). Upon information and belief, including the filing of a Form 8-K on December 10, 2015, Consilio succeeded to the liabilities of Huron with respect to Huron Legal.

46. Upon information and belief, Consilio and Huron have documents in their exclusive possession, custody, and control further setting forth the specific facts relating to the Consilio Purchase and the specific facts relating to the allegations set forth above, including without limitation, Huron's internal discussions and knowledge both prior to and after the acquisition of Sky regarding its revenue projections needed to achieve the Earn-Out amounts and its own financial performance.

47. On February 21, 2018, February 23, 2018, and on other subsequent dates, Gruner, for himself and the Former Shareholders, Huron, and Consilio, agreed to toll any applicable statute of limitations with respect to the claims set forth herein such that, ultimately, any such applicable statute of limitations period would not resume running until March 24, 2018.

## COUNT I

### Violation of the Illinois Securities Law
### (815 ILCS 5/12(F), (G), and (I))

48. Gruner restates and realleges Paragraphs 1 through 47 as though fully set forth herein.

49. It is a violation of § 12(F) of the ISL for any person "[t]o engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof."

50. Similarly, it is a violation of § 12(G) of the ISL "[t]o obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

51. Further, it is a violation of § 12(H) of the ISL "[t]o employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly."

52. Huron violated each of the foregoing ISL provisions when, between the commencement of negotiations with Sky in March 2014 and the closing of the share purchase on January 8, 2015, Huron made several misrepresentations, failed to correct previous representations, and failed to disclose material facts relating to Huron Legal's ability to generate revenue from Sky's business, its commitment to adding new Sky customers, and the stability of Huron Legal's operations and revenue.

53. Specifically, and as set forth in detail above, Huron violated each of the foregoing ISL provisions in connection with its acquisition of Sky's stock and conveyance of the Earn-Out rights to the Former Shareholders by making the following knowing and intentional misrepresentations and omitting the following material facts:

   a. Falsely pitching to the Former Shareholders certain revenue projections necessary to meet the Earn-Out payments as conservative in LOIs, operational planning meetings and communications with Sky;

   b. Falsely representing Huron's intentions to meet its obligations under the Purchase Agreement and to achieve the Earn-Out payments;

   c. Falsely representing Huron's ability to devote resources to achieve the Earn-Out payments;

11

    d. Failing to disclose to Sky that Huron Legal's revenues had fallen almost 50%, from $55.0 million in the first quarter 2014 to only $28.6 million in the fourth quarter;

    e. Falsely representing to Sky on December 24, 2014 that the objectives of Huron and Sky were aligned with respect to, among other things, the Earn-Out payments, regarding which Gruner had specifically inquired that day; and

    f. Falsely representing that Huron would let Gruner perform under the terms of the Subcontractor Agreement to assist in reaching the Revenue Threshold when in fact, Huron knew it had no plans to do so.

54. Huron intended for the Former Shareholders to rely on these misrepresentations and omissions of material facts to induce the Former Shareholders to agree to the Purchase Agreement and the Earn-Out provisions.

55. The Former Shareholders in fact relied on these misrepresentations and omissions of material facts when they agreed to the purchase price and the Earn-Out provisions.

56. The Earn-Out provisions Huron conveyed to Sky in connection with the Purchase Agreement constituted separate and distinct obligations under the Purchase Agreement for which consideration was to be paid by Huron that was separate and distinct from the $9 million purchase price for the Sky stock.

57. Based on Huron's assurances throughout negotiations, including without limitation Rowe's Christmas Eve 2014 email, the Former Shareholders had no reason to know that Huron Legal's own business was collapsing such that it would never be able to meet the Revenue Thresholds and make the Earn-Out payments. In fact, Rowe communicated just the opposite.

58. Had the Former Shareholders known the truth regarding Huron's misrepresentations and omissions, they would not have agreed to the acquisition, including the Earn-Out provisions.

59. Huron's misrepresentations and material omissions in connection with its acquisition of the Sky shares violate ISL §§ 12(F), (G), and (I).

60. As a direct and proximate result of Huron's violations of the ISL, and the Former Shareholders' reasonable reliance on Huron's material misrepresentations and omissions, the Former Shareholders have been damaged in an amount to be determined at trial, including without limitation, the $3 million the Former Shareholders should have received as Earn-Out payments but for Huron's material misrepresentations and omissions.

61. Upon information and belief, Consilio has assumed liability and is liable for paying any amounts due and owing to Gruner as a direct and proximate result of Huron's violations of the ISL alleged in this count.

62. Upon information and belief, internal documentation and communications necessary to further detail and prove the allegations contained within this count are in the exclusive possession, custody, and control of Consilio and Huron.

**WHEREFORE**, Gruner respectfully requests the Court to enter judgment in his favor on Count I of the Complaint and against Huron and Consilio, jointly and severally, and award the following relief:

(a) Compensatory Damages in an amount to be determined at trial, but in no event less than $3 million;

(b) Punitive Damages;

(c) Costs;

(d) Pre- and post-judgment interest; and

(e) Such other and further relief as the Court deems just and proper.

## COUNT II

### Fraudulent Inducement

63. Gruner restates and realleges Paragraphs 1 through 62 as though fully set forth herein.

64. Between the commencement of negotiations with Sky in March 2014 and the closing of the share purchase on January 8, 2015, Huron made several misrepresentations and failed to correct previous representations relating to Huron Legal's ability to generate revenue from Sky's business, its commitment to adding new Sky customers, and the stability of Huron Legal's operations and revenue.

65. Specifically, and as set forth in detail above, to induce Sky to agree to the Purchase Agreement, Huron made the following knowing and intentional misrepresentations:

   a. Falsely pitching to the Former Shareholders certain revenue projections necessary to meet the Earn-Out payments as conservative in LOIs, operational planning meetings and communications with Sky;

   b. Falsely representing Huron's intentions to meet its obligations under the Purchase Agreement and to achieve the Earn-Out payments;

   c. Falsely representing Huron's ability to devote resources to achieve the Earn-Out payments;

   d. Failing to disclose to Sky that Huron Legal's revenues had fallen almost 50%, from $55.0 million in the first quarter 2014 to only $28.6 million in the fourth quarter;

   e. Falsely representing to Sky on December 24, 2014 that the objectives of Huron and Sky were aligned with respect to, among other things, the Earn-Out payments, regarding which Gruner had specifically inquired that day; and

   f. Falsely representing that Huron would let Gruner perform under the terms of the Subcontractor Agreement to assist in reaching the Revenue Threshold when in fact, Huron knew it had no plans to do so.

66. Huron intended for the Former Shareholders to rely on these misrepresentations material facts to induce the Former Shareholders to agree to the Purchase Agreement and the Earn-Out provisions.

67. The Former Shareholders in fact relied on these misrepresentations of material facts when they agreed to the purchase price and the Earn-Out provisions.

68. The Earn-Out provisions Huron conveyed to Sky in connection with the Purchase Agreement constituted separate and distinct obligations under the Purchase Agreement for which consideration was to be paid by Huron that was separate and distinct from the $9 million purchase price for the Sky stock.

69. Based on Huron's assurances throughout negotiations, including without limitation Rowe's Christmas Eve 2014 email, the Former Shareholders had no reason to know that Huron Legal's own business was collapsing such that it would never be able to meet the Revenue Thresholds and make the Earn-Out payments. In fact, Rowe communicated just the opposite.

70. Had the Former Shareholders known the truth regarding Huron's misrepresentations, they would not have agreed to the acquisition, including the Earn-Out provisions.

71. As a direct and proximate result of Huron's material misrepresentations, the Former Shareholders have been damaged in an amount to be determined at trial, including without limitation, the $3 million the Former Shareholders should have received as Earn-Out payments but for Huron's material misrepresentations.

72. Upon information and belief, Consilio has assumed liability and is liable for paying any amounts due and owing to Gruner as a direct and proximate result of Huron's material misrepresentations alleged in this count.

73. Upon information and belief, internal documentation and communications necessary to further detail and prove the allegations contained within this count are in the exclusive possession, custody, and control of Consilio and Huron.

**WHEREFORE**, Gruner respectfully requests the Court to enter judgment in his favor on Count II of the Complaint and against Huron and Consilio, jointly and severally, and award the

following relief:

      (a)    Compensatory Damages in an amount to be determined at trial, but in no event less than $3 million;

      (b)    Punitive Damages;

      (c)    Costs;

      (d)    Pre- and post-judgment interest; and

      (e)    Such other and further relief as the Court deems just and proper.

Dated: March 23, 2018　　　　　　　　　　Respectfully submitted,

RONALD GRUNER, individually and as Representative of the former Stockholders of Sky Analytics, Inc.

By: /s/ Michael P. Tomlinson
One of his attorneys

Michael P. Tomlinson (email: mtomlinson@tomlinson-law.com)
Michael Munley (email: mmunley@tomlinson-law.com)
Tomlinson Law Office, P.C.
8501 W. Higgins Road, Suite 420
Chicago, IL 60631
Phone: (312) 715-8770
Fax: (866) 625-7089