**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RONALD GRUNER, individually, and as Representative of the former Stockholders of Sky Analytics, Inc., | ) ) ) | |
| | ) | |
| Plaintiffs | ) | No. 18 CV 02143 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| HURON CONSULTING GROUP, INC., and CONSILIO, INC., | ) ) | |
| | ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Ronald Gruner, on behalf of himself and other former shareholders of Sky Analytics, Inc., brings this suit against Huron Consulting Group, Inc. for allegedly violating the Illinois Securities Law, 815 ILCS 5/12 *et seq*. and engaging in common law fraudulent inducement during its acquisition of Sky. Consilio is sued as successor to Huron's Legal division, which it purchased after the Sky acquisition. Both companies moved to dismiss the complaint, arguing that Gruner is collaterally estopped by a prior arbitration from re-litigating issues central to both of his legal theories and that he nevertheless fails to state a claim. Because the issues presented in the prior arbitration are not identical to the ones raised here, collateral estoppel does not bar Gruner's complaint. And because Gruner adequately states a claim upon which relief can be granted, the motions are denied.

## BACKGROUND

At this juncture, the story is based on the plaintiffs' view of the facts, as set forth in the complaint. In March 2014, Huron Consulting Group, Inc. entered into negotiations with Sky Analytics, Inc. (and specifically with Sky's co-founder and CEO, Ronald Gruner) to acquire Sky—

from what the Court can glean from the complaint, both companies were involved in the field of legal analytics. The parties agreed early on that the acquisition would include two components: 1) an immediate cash payment and 2) subsequent "earn-out" payments whereby each dollar of revenue earned by Huron's legal division above a specified threshold would be paid to Sky shareholders. Compl. ¶ 18. While the parties were negotiating the level at which the threshold would be set, Huron presented Gruner with various projections regarding the legal division's ability to earn certain revenue amounts. Huron pitched the projections, which according to Gruner depended on Huron's commitment and ability to add new Sky customers as well as its own stability, as "conservative." *Id.* ¶ 20, 25. But the projections were in fact quite aggressive; relatedly, and unbeknownst to Sky, the revenue earned by Huron's legal division had fallen almost 50% from the first quarter of 2014 to the fourth. *Id.* ¶ 30.

As negotiations neared completion in December 2014, Gruner e-mailed Huron leadership to confirm that the companies' objectives with respect to achieving the earn-outs were aligned. Huron, making no mention of its financial condition, responded that it was "committed at all times to making sure we have the tightest alignment possible for every objective we pursue." *Id.* ¶ 33. The parties subsequently reached a deal, which was memorialized in a written "Stock Purchase Agreement" ("SPA") and signed by the parties on January 8, 2015. *Id.* ¶ 35. In addition to an up front purchase price of $9 million, the SPA provided for two earn-out periods. The revenue threshold was set at $2.5 million for the first period beginning April 2015 and $4 million for second period beginning April 2016, with the total amount of earn-out payments to the shareholders capped at $3 million. Huron and Gruner also signed a separate "Master Subcontractor Agreement and Statement of Work" outlining a variety of post-acquisition services Gruner would provide to Huron. *Id.* ¶ 38.

After the deal closed, Huron paid the initial purchase price but did not focus on selling Sky products and made little effort to achieve the revenue threshold necessary to trigger the earn-out payments. During the first earn-out period, Huron delivered less than 20% of its projected revenue amount. *Id.* ¶42. Further, Huron never engaged Gruner to perform post-closing services despite Gruner's requests to do so. Then, in December 2015 (less than a year after the acquisition and a few months before the first earn-out period ended), Huron sold its legal division (which included Sky) to Consilio Inc., another legal analytics company. *Id.* ¶45.

Upon learning that the threshold revenue amount had not been reached for the first earn-out period, Gruner initiated private arbitration against both Huron and Consilio in April 2017 seeking damages for breach of contract.[1] Specifically, Gruner alleged that the defendants violated the SPA's implied covenant of good faith and fair dealing by failing to take various actions which Gruner contends would have maximized the likelihood of achieving the full amount of the earn-outs. In a 34-page Arbitration Award, the arbitrator found that Huron (and Consilio, standing in Huron's shoes in relation to obligations owed to shareholders under the SPA) had not breached the covenant because their performances under the contract comported with its terms and because the inclusion of an earn-out provision did not by itself impose a duty on the defendants to make achievement of the earn-out a primary business objective. Arbitration Award, ECF No. 30-1.[2]

Gruner subsequently initiated this lawsuit against Huron and Consilio on behalf of himself and other former Sky shareholders. In contrast to the arbitration proceeding, Gruner does not allege

---

[1] The arbitration arose pursuant to a post-dispute agreement of the parties; there was no provision in either the Purchase Agreement or the Master Subcontractor Agreement requiring arbitration. Arbitration Award 2, ECF No. 30-1.

[2] In June 2019, this Court confirmed the arbitration award without objection from Gruner. *See* ECF No. 20, *Huron Consulting Group Inc. v. Gruner*, 19-cv- 02039 (N.D. Ill. June 26, 2019); ECF No. 22, *Consilio, Inc. v. Gruner*, 19-cv-02416 (N.D. Ill. June 26, 2019).

that Huron and Consilio breached the terms of the SPA; instead, he alleges that Huron fraudulently induced him and the other shareholders into entering the contract by making false representations about its intentions and ability to achieve the earn-out payments, in violation the Illinois Securities Law ("ISL"), 815 ILCS 5/12 *et seq*. and Illinois common law. *Id.* ¶ 53. He also alleges that Consilio assumed Huron's liabilities when it purchased Huron Legal by virtue of an agreement between the two companies. *Id.* ¶¶ 61, 72. Both defendants moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim.

## DISCUSSION

In its motion to dismiss, Huron argues that Gruner has failed to allege facts showing that he is entitled to relief under either the ISL or Illinois common law. Consilio argues that Gruner is barred by collateral estoppel from litigating certain issues essential to both of his legal theories and that he also fails to state a claim against Consilio because he has not established successor liability. For the reasons discussed below, the Court concludes that Gruner is not barred by collateral estoppel and that he adequately stated a claim against Huron and Consilio. Their motions to dismiss are therefore denied.

### I. Collateral Estoppel

Consilio argues that Gruner is collaterally estopped from litigating the issue of reliance, a necessary element of both of his fraudulent inducement theories (statutory and common law), because it was fully litigated in the prior arbitration.[3] Under Illinois law, collateral estoppel bars

---

[3] Consilio also argues that Gruner is collaterally estopped from litigating the issue of whether Gruner's alleged reliance caused him to suffer damages. The Court rejects that argument out of hand because the arbitrator explicitly stated that he had no need to address that issue. *See* Arbitration Award at 34 ("[I]t is not necessary to consider damages nor the question as to whether there is sufficient evidence to find damages."). Any statements made by the arbitrator regarding whether certain performances caused damages, then, cannot be considered essential findings.

parties from relitigating issues where "(1) the party against whom the estoppel is asserted was a party to the prior adjudication, (2) the issues which form the basis of the estoppel were actually litigated and decided on the merits in the prior suit, (3) the resolution of the particular issue was necessary to the court's judgments, and (4) those issues are identical to issues raised in the subsequent suit." *Wells v. Coker*, 707 F.3d 756, 761 (7th Cir. 2013).[4] Only the third and fourth elements are in dispute here.

### A.      Identity of Issues

The Court turns first to whether the issues decided in the arbitration are "identical" to the issues presented in the current complaint. To do so, the Court must "determine with precision what matters actually were decided" in the arbitration proceeding. *In re Calvert*, 913 F.3d 697, 701 (7th Cir. 2019).

In the arbitration, Gruner alleged that Huron and Consilio breached their duty of good faith and fair dealing by 1) failing to operate the business in a manner that would maximize the earn-out payments; 2) not keeping Gruner involved during the period following acquisition; 3) not

---

[4] In their briefs, the parties focus predominately on federal preclusion law. It is Illinois preclusion law, however, that applies here. An arbitration award confirmed by a district court "may be enforced as if it had been rendered in an action in the court in which it is entered," 9 U.S.C. § 13, and the arbitration award at issue here was confirmed by this Court sitting in diversity in Illinois. In diversity cases, "federal law incorporates the rules of preclusion applied by the State in which the rendering court sits." *Taylor v. Sturgell*, 553 U.S. 880, 891 n.4 (2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508–09 (2001)). *See also NTCH-WA, Inc. v. ZTE Corp.*, 921 F.3d 1175, 1180 (9th Cir. 2019) ("Because a federal-court order confirming an arbitration award has 'the same force and effect' as a final judgment on the merits, 9 U.S.C. § 13, and because we determine the preclusive effect of a prior federal diversity judgment by reference to the law of the state where the rendering court sat, we hold that when a federal court sitting in diversity confirms an arbitration award, the preclusion law of the state where that court sits determines the preclusive effect of the arbitral award."). And even if the award had not been confirmed, state law "seems to be consulted when an award that has not been confirmed is presented to a federal court in an action that involves a state-law claim." 18B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 4475.1 (2d ed.). Because Illinois preclusion law and federal preclusion law are essentially the same, however, the arguments made by the parties still apply.

assuring that Huron Legal's leadership team remained intact; 4) failing to provide incentives to sales personnel in a manner that would insure that earn-out objectives would be achieved; 5) failing to support the development and marketing of Sky's products; and 6) selling Sky to Consilio, which had no interest in the product. Arbitration Award at 5.

The arbitrator began his analysis of these contentions by explaining that the duty of good faith and fair dealing, while under Illinois law is implied in all contracts, does not create specific duties. *Id.* at 27 (citing *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 989-90 (1984)). Rather, the duty of good faith and fair dealing "goes to work to define what is prohibited or permissible where under an agreement an obligated party is left to its own discretion with regard to matters which were outside of the contemplation of the parties when the agreement was formed." *Id.* at 28. In concluding that there was no breach, the arbitrator described the parties' pre-contract negotiations and stated that the alleged shortcomings in the defendants' performance were requirements that were "either rejected by the Buyer or things that were evidenced as considered and not asked for"—*i.e.*, they were within the contemplation of the parties and therefore outside the scope of the duty of good faith and fair dealing. The arbitrator also concluded that the mere inclusion of the earn-out as a contract term did not impose on Huron and Consilio a primary duty under the agreement to pursue the earn-out objective independently of their general business interests and that their performances with respect to the earn-out objective were reasonable and not taken with the intent to defeat the earn-out. *Id.* at 29.

In the present action, by contrast, Gruner alleges that Huron and Consilio violated the ISL and engaged in common law fraudulent inducement—that is, Gruner's focus in this case is not on whether Huron performed its contractual duties under the agreement the parties reached, but whether it misled Gruner into agreeing to those terms. To succeed under both of these fraudulent

6

inducement theories, Gruner must show (among other things) that he reasonably relied upon false statements of material fact. *See Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (setting forth elements of a fraudulent inducement action); *Meyer v. Ward*, 13 C 3303, 2017 WL 6733726, at *6 (N.D. Ill. Dec. 18, 2017) (setting forth elements of an ISL fraud action). Gruner maintains that he and the other Sky shareholders relied on Huron's 1) false statement that its revenue projections were "conservative"; 2) false representation that it intended to meet its obligations and achieve the Earn-Out payments; 3) false representation that it had the ability to devote resources to achieve the Earn-Out payments; 4) failure to disclose that its revenues had fallen almost 50% from the first quarter of 2014 to the fourth; 5) false representation that its objectives were aligned with Sky's; and 6) false representation that it would allow Gruner to perform under the terms of the Subcontractor Agreement.

### 1.    Reliance[5]

The gist of Consilio's estoppel argument is that in finding that there was no breach of contract, the arbitrator necessarily concluded that Gruner could not have relied on the alleged

---

[5] Neither defendant argues that the integration provision in the SPA bars Gruner's fraudulent inducement claims, probably for good reason. Surveying Illinois law, the Seventh Circuit has held that standard integration clauses do not preclude fraudulent inducement claims. *See Vigortone AG Prod., Inc. v. PM AG Prod., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002). So-called "no-reliance" clauses, however, do preclude fraudulent inducement claims because they inherently disprove reasonableness. *Id.* As explained in *Triumph Packaging Group v. Ward*, 877 F. Supp. 2d 629, 647–48 (N.D. Ill. 2012), the Seventh Circuit has acknowledged that, under Illinois law, for a clause to be considered a no-reliance clause, and not an integration clause, it must explicitly disavow any "reliance." Compare *Vigortone*, 316 F.3d at 645 (stating absent a "reference to reliance," the clause at issue is a "standard integration clause," that does not bar a fraud claim) with *Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000) (holding that a clause that assured the plaintiff "had not relied on any prior oral statement" in making the transaction in dispute was a no-reliance clause). The parties have not included the SPA with their briefs, but the content of the integration clause is set forth on page 29 of the Award, which reveals it to be a standard integration clause that does not render reliance on misrepresentations outside the agreement unreasonable as a matter of law.

misrepresentations because they had been rejected rather than included in the contract's terms. As a general matter, the question of what was "within the parties contemplation" (the issue with which the arbitrator was primarily concerned) is not fully answered by reference to the specific terms each of the parties sought to include in the SPA; those terms do not delimit the boundaries of reliance. Contrary to Consilio's arguments, the fact that Huron refused to include certain terms in the contract (such that subsequent performance which conflicted with those rejected terms was "within the parties contemplation" and therefore outside the duty of good faith and fair dealing) does not mean that Gruner and the other shareholders could not have relied on other non-memorialized representations about Huron's intentions and expectations as to its operation of the Sky business. The arbitrator found, for example, that Huron rejected Gruner's request that the SPA include a clause that would commit Huron to use its best efforts to achieve the earn-out. Arbitration Award at 10. That meant (as the arbitrator concluded) that Huron could not be deemed in breach of its contractual duty of good faith and fair dealing by failing to use "best efforts" to achieve revenues that would trigger earn-out payments to the Sky shareholders. And if Gruner's claim was that it was induced to enter into the contract by Huron's representation that it would use its best efforts to achieve the earn-outs, it would fail; his reliance on that representation would not have been reasonable in light of Huron's refusal to include a best efforts requirement in the contract. But Huron's rejection of a "best efforts" contract term did not give Huron license to assure Gruner that it would be "committed at all times to making sure we have the tightest alignment possible" with respect to achieving the earn out thresholds if, in fact, its intention was (say) to avoid paying the earn outs so as to reduce the price of the business. Nor does it necessarily follow from the arbitrator's finding that "there were no representations regarding Huron's financial condition in the SPA, nor were any asked for," *id.* at 11, that Gruner could not have relied on statements and

omissions by Huron about its financial condition during negotiations. Huron may have had no duty to disclose its deteriorating financial condition, but the absence of such a duty did not immunize Huron from liability for misrepresenting that condition (if, as alleged, it did so).

The distinctions that Gruner draws are somewhat subtle, to be sure, and Huron's refusal to include certain terms that Gruner requested is not without probative force as to the issue of whether Gruner reasonably relied on Huron's representations about similar terms when he agreed to sign the contract. But it does not establish a lack of reliance as a matter of law. Nor does it definitively establish that the alleged reliance was unreasonable.[6] The Seventh Circuit has noted that Illinois courts will not invalidate contracts on grounds of fraudulent inducement when "the complaining party could have discovered the fraud by reading the contract." *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (concluding that there was no reasonable reliance where terms of the lease were explicitly different from the alleged oral representations). But this is not a case like *Cozzi* in which the contradiction between the terms of the contract (or even the terms that were negotiated but not included in the contract) and the alleged extracontractual misrepresentations are patent and irreconcilable. The crux of the arbitrator's award was that certain terms were rejected as measures of good faith performance; the arbitrator did not, and was not asked to, address whether terms were included which explicitly contradicted the pre-contract statements with which Gruner now takes issue.

---

[6] Consilio argues that the arbitrator made findings about what was within the parties' contemplation prior to entering the contract in order to determine whether Huron and Consilio's performance was in line with pre-contract expectations. Consilio's Reply Br. 6-7, ECF No. 53. But that mischaracterizes the award. To the extent the arbitrator made findings about the shareholders' "reasonable expectancies," he focused on what one could reasonably expect based on the fact that an earn-out provision was included in the contract. Arbitration Award at 30 (explaining that the duty of good faith and fair dealing is limited by the reasonable expectations *emanating from specific language in the contract*). He did not make findings about what the shareholders reasonably expected based on allegedly fraudulent statements made during the negotiations.

9

Consilio also points to more granular findings made by the arbitrator. For example, the arbitrator found that Gruner "admitted he was taking a risk that Huron might take the business in a different direction" and that Gruner "understood there would be uncertainties." Arbitration Award at 25. But these admissions are not logically inconsistent with reliance on Huron's representations that their ***objectives*** (*i.e.,* their goal of reaching the earn-outs) were aligned. Relatedly, Gruner's admission that his participation in the business post-acquisition was not necessarily critical to achieving the earn-out, *id.*, does not mean that Huron's statement that Gruner would have a role in the company did not induce Gruner into signing the contract in the first place, or that it would not be actionable if, in fact, Huron never intended to deliver on that assurance.[7]

The cases cited by Consilio do not compel a different conclusion. In *General Electric Business Financial Services, Inc. v. Silverman*, 693 F. Supp. 2d 796, 804 (N.D. Ill. 2010), for example, the court held that the defendants in a breach of contract action could not litigate the issues underpinning their fraudulent inducement affirmative defense because they had already been litigated in a prior action brought by those same defendants for fraud. Those facts do not resemble the scenario at issue here, however, where the breach of contract theory in one case and the fraud theory in the other were advanced by the same party. And collateral estoppel was not even discussed in *Incor Properties, Inc. v. Newton*, 90 C 6228, 1991 WL 60585, at *1 (N.D. Ill. Apr. 16, 1991) or *Roundy's Supermarkets, Inc. v. Nash-Finch Co.*, 08C0142, 2008 WL 5377907, at *1 (E.D. Wis. Dec. 23, 2008). The courts in those cases did note that parties had asserted duty of good faith and fair dealing claims based on the same misrepresentations that formed the basis

---

[7] It is worth noting here that loss causation—the fact that defendant's actions had something to do with the drop in value—is not a required element of a claim brought under the ISL, although it is required in common law fraud actions. *Meyer v. Ward*, 13 C 3303, 2016 WL 5390953, at *6 (N.D. Ill. Sept. 27, 2016). *See infra* at p. 23.

of their fraudulent inducement claims, but the fact that the two theories **can** be premised on the same facts or issues does not mean that they are here. To the contrary, Gruner does not appear to have alleged in the breach of contract arbitration that Huron made any misrepresentations at all.

To that point, Consilio also cites to *Rudell v. Comprehensive Accounting Corporation*, 802 F.2d 926 (7th Cir. 1986), *Plastic Recovery Technologies Co. v. Samson*, No. 11 C 2641, 2011 WL 3205349 (N.D. Ill. July 28, 2011), and *Putzier v. Ace Hardware Corp.*, No. 13 C 2849, 2016 WL 1337295 (N.D. Ill. Mar. 30, 2016) for the proposition that parties cannot undermine arbitration awards by subsequently filing federal lawsuits alleging that the contract at issue was procured by fraud. Those three cases, however, dealt with claim preclusion, not issue preclusion. And while claim preclusion (or "res judicata") bars subsequent litigation of issues that "could have been brought" in the initial proceeding, issue preclusion does not. *See Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 988 F.2d 1480, 1492 (7th Cir. 1993) (Shadur, Senior District Judge, sitting by designation, concurring in the result) ("[I]t is fundamental to claim preclusion, in contrast to issue preclusion, that the former bars not only every issue that was urged by the losing party but also every issue that could have been urged in support of its position."). Consilio asserts only that Gruner is barred by issue preclusion; it presumably did not raise a claim preclusion defense because Gruner's fraudulent inducement argument was outside the scope of the parties' arbitration agreement such that Gruner could not have asserted it. *See* Arbitration Award at 3 (describing arbitration agreement as applying to disputes regarding the earn-out amounts); *see also* Pl.'s Resp. in Opp'n. to Consilio's Mot. to Dismiss 13, ECF No. 47 (explaining that Gruner suggested arbitrating his fraud claims despite the fact that they fell outside the arbitration agreement but that defendants refused). These cases are therefore irrelevant.

11

All that said, one of the arbitrator's findings does pose a problem for Gruner. The complaint alleges that Gruner relied on Huron's statements made during the summer of 2014 that its revenue projections were "conservative." Compl. ¶¶ 20, 29. But the arbitrator found that Gruner "believed that all of these forecasts were very aggressive." Arbitration Award at 9. That finding is squarely at odds with Gruner's allegation that he relied on Huron's characterization of its projections as "conservative," a point which Gruner does not address in his response brief.[8]

Issue preclusion requires more than a prior ruling about Gruner's belief about the integrity of Huron's financial projections, however; it must also be determined whether the arbitrator's finding about Gruner's belief was essential to the arbitration award. According to Illinois courts, and consistent with common understanding, a finding is "essential" for collateral estoppel purposes if the court could not have reached its judgment without making it. *Ross Advert., Inc. v. Heartland Bank & Tr. Co.*, 2012 IL App (3d) 110200, ¶ 43, 969 N.E.2d 966, 979. It was necessary here for the arbitrator to address the pre-contract negotiations and rejected terms because that determined what performances were "within the parties' contemplation" at the time of contracting, which in turn determined whether the duty of good faith and fair dealing applied. *See* Arbitration Award at 28 ("It is only where a party acts in a manner that could not have been contemplated at the time of contracting that courts will step in and impose a good faith requirement.") (citing *MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 995 F. Supp. 929, 933 (N.D. Ill. 1998)). But the Court is hard-pressed to see, and Consilio makes no argument, that the arbitrator's specific finding that Gruner believed Huron's projections to be aggressive factored into his decision regarding whether Huron's post-

---

[8] To complicate matters, the arbitrator also found that a week before the SPA was signed in early January 2015, Gruner learned that Huron's Board had been given a much lower forecast, at which point Huron described ***that*** forecast as conservative. Gruner could have potentially relied on that representation despite believing that the earlier, higher forecasts were aggressive, but he does not include specific allegations to that effect in his complaint.

contract performance complied with the terms of the contract. Accordingly, the Court concludes that the finding was not essential to the judgment and that Gruner is not barred from re-litigating the issue now.

### 2. False Statements

Consilio frames its collateral estoppel argument in the context of reliance, but it also identifies various findings made by the arbitrator which would appear to negate a different element of Gruner's claim: whether the statements made by Huron were in fact false or misleading. First, Gruner alleges in his current complaint that Huron falsely represented its ability to devote resources to achieve the earn-out amounts, but the arbitrator found that "post-acquisition, Sky appears to have had considerably more, in terms of resources, available to it for marketing, rather than less." Arbitration Award at 19. That says nothing about reliance, but it does cast doubt on whether Huron's representations about its ability to devote resources was false. Even so, Sky could have "more resources available for marketing" than it did prior to the acquisition and still not have the level of resources it was told was available, so there is no preclusive identity of issues there. The arbitrator's finding that neither Huron's nor Consilio's challenged actions were taken in bad faith or with the intent to defeat the earn-out certainly does not help Gruner's current allegation that Huron falsely represented its intentions to reach the earn-out thresholds, but the damage isn't necessarily fatal. The arbitrator's finding does not preclude the possibility that Huron and Consilio could have acted in good faith in complying with the terms of the contract while acting in bad faith in inducing Gruner to enter that contract in the first place; the arbitrator simply did not address pre-contract inducement. *See* Arbitration Award at 16 ("[T]he Shareholders do not base their claim that the lack of disclosure wrongfully induced them to enter the agreement.").

## II.    Sufficiency of the Complaint[9]

Since collateral estoppel does not bar Gruner's complaint, the Court turns next to the sufficiency of Gruner's factual allegations. To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Heightened pleading standards, however, apply to complaints alleging fraud: Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See also Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (Rule 9(b) applies to securities fraud claims).

### A. Illinois Securities Law

Huron advances three main arguments in support of its contention that Gruner is not entitled to relief under the ISL. First, it argues that the ISL does not provide a remedy for sellers

---

[9]As Consilio notes, Gruner does not allege that Consilio itself engaged in wrongdoing. Rather, Gruner alleges that Consilio is liable for Huron's actions because "Consilio succeeded to the liabilities of Huron with respect to Huron Legal" when it purchased Huron Legal. Compl. ¶ 45. In Illinois, a corporation that purchases the assets of another can be held liable for the debts or liabilities of the transferor corporation "if there is an express or implied agreement of assumption." *Diguilio v. Goss Int'l Corp.*, 389 Ill. App. 3d 1052, 1060, 906 N.E.2d 1268, 1276 (1st Dist. 2009). Gruner alleges, based on Huron's December 10, 2015 Form 8-K, that Consilio agreed to assume Huron's liabilities with respect to the SPA. The 8-K, which Consilio attached to its motion to dismiss, states that Consilio will assume "certain liabilities" of Huron Legal, Form 8-K, ECF No. 30-3, and the complaint describes Huron Legal as a division of Huron, Compl. ¶ 5. It is plausible to infer that the liabilities Consilio assumed with respect to Huron Legal included a potential $3 million debt that was contingent on Consilio's—not Huron Legal's—future performance. That is sufficient to state a plausible claim against Consilio at this juncture. *See Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1084 (7th Cir. 1997) (suggesting that a successor corporation's motion to dismiss should be denied if plaintiff adequately alleges an exception to general rule that successor's are not liable for seller's debts).

and that, even if it did, Gruner failed to comply with the statute's procedural requirements. Second, it argues that Gruner failed to sufficiently allege that Huron made misrepresentations of material fact (and this argument applies with equal force to Gruner's common law fraudulent inducement theory). Third, Huron argues that the ISL does not permit private causes of action for damages. The first two arguments are without merit; the third is not fatal to Gruner's complaint.

### 1. Remedy for Sellers

Given explicit Seventh Circuit precedent to the contrary, the Court rejects Huron's contention that sellers are without a remedy under the ISL. The sections of the ISL invoked by Gruner prohibit "any person" from engaging in "any transaction . . . in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof," 815 ILCS 5/12(F), obtaining money "through the sale of securities by means of any untrue statement of a material fact," 815 ILCS 5/12(G), and employing "any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly," 815 ILCS 5/12(I). On their face, these provisions appear to apply to sellers and purchasers alike.

Section 13 of the ISL sets out the available private remedies for the above violations: section 13(A) makes "every sale of a security made in violation of the provisions of this Act . . . voidable at the election of the purchaser," 815 ILSC 5/13(A), and section 13(G) permits "any party in interest" to bring an action "to enforce compliance with this Act." 815 ILSC 5/13(G). According to Illinois courts, section 13(A) of the ISL provides private causes of action to purchasers **only**. *See, e.g., Space v. E.F. Hutton Co., Inc.*, 188 Ill. App. 3d 57, 61, 544 N.E.2d 67, 70 (4th Dist. 1989) ("It is evident by the very wording of section 13(A) that the remedies under the [ISL] are available only to purchasers of securities."). Gruner, as the seller, therefore has no cause of action under section 13(A). Gruner maintains that he may nevertheless seek relief

pursuant to section 13(G). And indeed, the Seventh Circuit held in *Klein v. George G. Kerasotes Corporation* that section 13(G), the express terms of which apply to "any party in interest," provides a remedy for stock sellers. 500 F.3d 669, 673 (7th Cir. 2007) (holding that the ISL's statute of repose, which can apply even where a complaint does not directly invoke the ISL, applied to a seller's complaint alleging breach of fiduciary duty and common law fraud because the alleged acts were cognizable under the ISL). The mere fact that Gruner was a seller, then, does not preclude him from asserting a cause of action under the ISL.[10]

But that does not end the inquiry, because Huron further maintains that even if sellers are entitled to relief under the ISL, Gruner failed to comply with 815 ILCS 5/13(B), which states in relevant part that "notice of any election provided for in subsection A of this Section shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable." To be clear, Gruner seeks relief under Section G, not Section A. But Huron argues that Gruner must nevertheless comply with Section B because otherwise

---

[10] Three years after *Klein* was decided, the Illinois Appellate Court in *Carpenter v. Exelon Enterprises Co.*, *LLC*, reached the opposite conclusion, holding that subsection 13(G) does **not** provide sellers with a retrospective remedy. 399 Ill. App. 3d 330, 338, 927 N.E.2d 768, 777 (1st Dist. 2010) (describing the remedy contained in 13(G) as prospective in nature and holding that it does not provide a retrospective right of rescission to any party). The Illinois Supreme Court denied a petition for leave to appeal. *Carpenter v. Exelon Enterprises Co., LLC*, 938 N.E.2d 519 (2010). Huron urges this Court to adopt the *Carpenter* court's reasoning and dismiss the complaint. But where the Illinois Supreme Court has not ruled on an issue, Illinois Appellate Court decisions control only if there are not "persuasive indications that the Illinois Supreme Court would decide the issue differently." *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015). The reasoning set forth by the Seventh Circuit in *Klein*—for example that general policies cannot override the explicit language of the statute—provides those indications. And in any event, in the absence of intervening precedent from the Illinois Supreme Court, this Court is not free to disregard the Seventh Circuit's determination of what Illinois law provides; decisions of intermediate state courts do not "liberate district judges from the force of [the Seventh Circuit's] decisions." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) (explaining that district courts must follow Seventh Circuit's interpretation of state law unless the state's supreme court "terminates the authoritative force" of that interpretation).

sellers would have the same remedy and rights as purchasers without having to comply with the procedural notice requirements. The Seventh Circuit in *Klein*, however, explicitly rejected this reasoning. Noting that a stock seller could not possibly comply with Section B, it explained that "finding that stock sellers have a remedy under § 13(G) does not give them an undeserved break" because stock purchasers who seek a remedy under that section have identical obligations. *Klein*, 500 F.3d at 673. Accordingly, Gruner may assert his claim based on the ISL notwithstanding the fact that he was the seller.

### 2. Allegations of Material Misrepresentations

The Court turns next to Huron's argument that Gruner has failed to sufficiently allege that Huron made misstatements of material facts, a required element under both Gruner's ISL anti-fraud and common law theories. *See Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 455, 813 N.E.2d 1138, 1142 (1st Dist. 2004). First, Huron argues that Gruner has not adequately alleged facts to show the falsity of Huron's statement that its revenue projections were conservative. The Court disagrees; Gruner alleged that the projections were not conservative but were in fact aggressive, and this fact is supported by Gruner's subsequent allegation that Huron delivered "less than 20 percent of its projected amount." Compl. ¶ 42. Huron also argues that Gruner failed to allege facts showing that Huron "believed its projections were overly aggressive in the summer of 2014." Huron's Opening Br. 11, ECF No. 34. But that does not undermine his ISL theory because (unlike Illinois common law fraud) the ISL does not require proof of scienter. *See Weinberg v. Blumenfeld*, 16 F.3d 1226 (7th Cir. 1994); *see also Hollerich v. Acri*, 259 F. Supp. 3d 806, 814 (N.D. Ill. 2017) (*citing Foster v. Alex*, 213 Ill.App.3d 1001, 1005–06, 572 N.E.2d 1242 (1991).

Huron next contends that four of Gruner's alleged misrepresentations are oral promises of future conduct and thus cannot constitute fraud. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012) (explaining that promissory fraud is not actionable in Illinois unless the plaintiff shows that the act was a part of a scheme to defraud). Huron points specifically to Gruner's allegations that Huron 1) falsely represented its intention to achieve the earn-out, Compl. ¶ 53(b); 2) falsely represented its ability to devote resources to achieve the earn-out, ¶ 53(c); 3) falsely represented that its objectives were aligned, ¶ 53(e); and 4) falsely represented that it would let Gruner perform under the terms of the Subcontractor Agreement, ¶ 53(f). Only the fourth allegation, however, involves a promise of future conduct.[11] As to that allegation, Gruner alleges that Huron never intended to allow him to perform services under the contract—despite knowing that Gruner believed he would continue to play a role in the company—and that Huron represented otherwise to induce him to sign the SPA. *Id.* ¶ 39. That is sufficient to invoke the "scheme" exception given that Gruner alleges that Huron made at least five other material misrepresentations and in light of Illinois courts' relatively expansive view of the exception. *See Henderson Square Condo. Ass'n v. LAB Townhomes*, LLC, 2015 IL 118139, ¶ 69, 46 N.E.3d 706, 725, *opinion modified on denial of reh'g* (Jan. 28, 2016) (exception invoked where plaintiff alleged that defendants made false representations in a scheme to induce purchasers); *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 169, 545 N.E.2d 672, 683 (1989) (scheme consisted of multiple false promises of future payment in order to induce plaintiff to continue to

---

[11] Huron, without citation, argues that Gruner's failure to include the word "current" in his other three allegations (*e.g.*, that Huron falsely represented its "current" ability to devote resources) is fatal. The Court disagrees; Gruner's allegations can reasonably be interpreted as concerning statements about its intentions and abilities at the time the statements were made, and on a motion to dismiss, the plaintiff is entitled to all reasonable inferences.

provide services); *Stamatakis Indus., Inc. v. King*, 165 Ill. App. 3d 879, 883, 520 N.E.2d 770, 773 (1st Dist. 1987) (protracted negotiations show that scheme was alleged).

Huron also makes a cursory argument that Gruner did not adequately allege that Huron's failure to disclose its financial difficulties in the fourth quarter of 2014 constituted a material omission because Huron "consistently and fully disclosed its financial situation every quarter." Huron's Opening Br. 10, ECF No. 34. The complaint does not allege those facts and resolving factual disputes is not proper at the motion to dismiss stage, so the Court must reject this argument at this juncture. Huron also urges the Court to consider the "overarching implausibility of Plaintiff's theory—i.e., that Defendants engaged in a fraudulent scheme whereby Huron paid nine million dollars to acquire Sky, with the alleged intent to let the business collapse and prevent Sky from receiving an additional three million dollars." Huron's Reply Br. 2, ECF No. 57. This argument has some force (who would pay $9 to save $3?), but Gruner does not allege that Huron intentionally let the business collapse. Gruner's actual theory—that Huron fraudulently led Gruner to believe that the total payout under the deal would be significantly higher than was possible under the circumstances—is at least as plausible as Huron's characterization of the alleged scheme. Under that scenario, the premise is not that the object of Huron's alleged neglect was to ruin the business but rather that Huron's efforts were calibrated to ensure that it would underperform earn-out projections that were already unrealistically aggressive and thereby effectively lower the price Huron paid for Sky by up to the $3 million.

Finally, the Court cannot, on this motion, accept the defendants' argument that Gruner's ISL claim is time barred. The defendants argue that Gruner is collaterally estopped from re-litigating the issue of when he learned of Huron's purported financial conditions. *See* Consilio's Opening Br. at 9. And because the arbitrator found that Gruner learned of the financial issues on

19

January 8, 2015, his ISL claim (which was brought in March of 2018) falls outside of the three-year statute of limitations. *See* 815 ILCS 5/13(D). The Court doubts whether the arbitrator's statement regarding the timing of Gruner's discovery was essential to his judgment, but even if it were, Gruner alleges that the parties agreed to toll any applicable statute of limitations. Compl. ¶ 47. Consilio responds that the parties made that agreement after Gruner's claim had already expired. But it does not necessarily follow that a tolling agreement cannot save an expired claim. *See e.g. United States v. Hitachi Am., Ltd.*, 172 F.3d 1319, 1334 (Fed. Cir.1999) (defendant waived limitations period for both expired and unexpired claims where parties' agreement stated that the defendant would not assert any statute of limitations defense in any action). In Illinois, tolling agreements are reviewed "in accordance with well-established contract principles" with the primary goal of giving effect to the parties' intent. *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill. App. 3d 632, 636, 888 N.E.2d 657, 662 (1st Dist. 2008). Without reviewing the tolling agreement, which neither party has provided, the Court cannot conclude that the complaint "plainly reveals" that it is untimely. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). At present, then, there is not a sufficient basis to conclude that a claim based on the ISL would be untimely.

### 3. Damages

Huron also maintains that the Gruner's ISL claim fails because damages are not available to remedy the alleged violation. This presents a question that has not been clearly decided by either Illinois or federal courts. In his complaint, Gruner requests compensatory damages "in an amount to be determined at trial, but in no event less than $3 million," punitive damages, and "such other and further relief as the Court deems just and proper." Compl. ¶ 62. As Huron notes, the ISL does not expressly provide for a private right of action for damages. *Peoria Union Stock Yards Co. Ret.*

*Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 324 (7th Cir. 1983). Section 13(G), which Gruner invokes, states that

> [u]pon a proper showing, the court shall grant a permanent or preliminary injunction or temporary restraining order or rescission of any sales or purchases of the securities determined to be unlawful under this Act, and may assess costs of the proceedings against the defendant.

815 ILCS 5/13(G). While the interpretive canon *expressio unius est exclusio alterius* would suggest that damages are not available under the statute, the Seventh Circuit has not had occasion to so decide. It did explain in *Peoria* that a prior case, *Hiddell v. International Diversified Investments*, 520 F.2d 529, 532 n. 3 (7th Cir.1975), "seems to hold that damages suits are possible under the Illinois Securities Law," but went on to note that the *Hiddell* court did not explicitly discuss the issue and may have confused rescission (which the ISL explicitly authorizes) with damages. *Peoria*, 698 F.2d 320 at 324.

The Illinois Supreme Court, however, has stated (also without further discussion) that "[r]emedies under [sections 12 and 13 of the ISL] include rescission **and awards of damages**." *In re Liquidation of Sec. Cas. Co.*, 127 Ill. 2d 434, 450, 537 N.E.2d 775, 783 (1989) (emphasis added). On the other hand, one Illinois appellate court subsequently held that the **only** remedy under the ISL is rescission, *see Lucas v. Downtown Greenville Inv'rs Ltd. P'ship*, 284 Ill. App. 3d 37, 52, 671 N.E.2d 389, 399 (2d Dist. 1996), and some courts within this district agree. *See Reshal Associates, Inc. v. Long Grove Trading Co.*, 754 F. Supp. 1226, 1236 (N.D. Ill. 1990) *and Renovitch v. Stewardship Concepts, Inc.*, 654 F. Supp. 353, 359 (N.D. Ill. 1987); *but see Meyer v. Ward*, 13 C 3303, 2016 WL 5390953, at *6 (N.D. Ill. Sept. 27, 2016) (citing *In re Liquidation* for the proposition that the ISL includes a damages remedy).

The Court is skeptical that the Illinois Supreme Court would find an implied damages remedy if it analyzed the statute in detail; its reference to damages in *In re Liquidation* likely

referred only to the monetary relief awarded under section 13(A) to facilitate rescission. *See* 815 ILCS 5/13(A)(1) (providing that upon rescission, seller must refund purchaser the full amount paid less any income received by purchaser on the securities). In any case, the issue need not be decided now because Gruner has alleged facts which show that he is entitled to some sort of relief (whether under the ISL or a common law theory of fraud; see below). That is enough to defeat a motion premised on Rule 12(b)(6). The types of remedies that the plaintiff may properly seek are not the proper subject of a motion to dismiss for failure to state a claim for relief. *Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002) (demand for relief is not part of a claim, so failure to specify relief to which plaintiff is entitled does not warrant dismissal under rule 12(b)(6)).

## III.    Fraudulent Inducement

Rule 12(b)(6) speaks to the dismissal of claims, not legal theories; because Gruner advances two legal theories in support of the same claim, the fact that the claim may proceed under one is sufficient to avoid dismissal. *See Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012) (a claim survives if it is supported by at least one recognized legal theory). Having concluded that the complaint states a claim under the ISL, it is not necessary to evaluate the sufficiency of the claim under a common law fraudulent inducement theory. Nevertheless, a few comments regarding Gruner's common law fraudulent inducement theory bear mentioning, particularly because the available remedies under that theory go beyond rescission. *See Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 276 (7th Cir. 1996) (discussing damage calculations in Illinois common law fraud case).

Under Illinois law, a claim for fraudulent inducement must aver "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5)

22

damage to the other party resulting from such reliance." *Hoseman*, 322 F.3d at 476. Unlike the ISL, these elements encompass scienter and "loss causation." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 844 (7th Cir. 2007); *see also Ray v. Citigroup Glob. Markets, Inc.*, 482 F.3d 991, 994 (7th Cir. 2007) (loss causation refers to the fact that the defendant's actions had something to do with the drop in value).

Gruner adequately alleges loss causation—the thrust of his complaint is that everything Huron allegedly misrepresented or omitted caused Huron to be unable to achieve the earn-outs. *See, e.g.*, Compl. ¶ 57 (suggesting that Huron would never be able to meet the revenue thresholds because its business was collapsing); *see also AnchorBank, FSB v. Hofer*, 649 F.3d 610, 618 (7th Cir. 2011) ("[W]e do not require that a plaintiff plead that all of its loss is necessarily attributed to the actions of the defendant, only that it plead that the defendant is at least one plausible cause of the economic loss.).

The same goes for Gruner's allegations of scienter. As noted above, Huron argues that Gruner failed to allege that Huron knew its projections were aggressive at the time it told Gruner that they were conservative. In response, Gruner points to his allegation that "upon information and belief," Huron has documentation which demonstrates that it knew by August 2014 that its projections were extremely aggressive. Compl. ¶ 28. As Huron notes, however, a plaintiff may plead fraud "upon information and belief" only where he demonstrates that the facts constituting fraud are not accessible to the plaintiff and the plaintiff provides grounds for his suspicions that make the suspicions plausible. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). Gruner explains in his brief that the documents at issue were produced by Huron during the arbitration but are subject to a protective order, and that the arbitrator denied Gruner's request for relief from the order. *See* Pl.'s Resp. in Opp'n to Huron's

Mot. to Dismiss Ex. A, ECF No. 48-1. That satisfies Gruner's burden notwithstanding the fact that he did not include these allegations in his complaint. *See Deb v. SIRVA, Inc.*, 832 F.3d 800, 813 (7th Cir. 2016) (party appealing Rule 12(b)(6) dismissal may elaborate on factual allegations so long as elaborations are consistent); *Geinosky v. City of Chicago*, 675 F.3d 743, 745, n.1 (7th Cir. 2012) (plaintiff opposing a Rule 12(b)(6) motion has "more flexibility" than the moving party and may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove).

Gruner has accordingly stated a claim which is cognizable under both the ISL and Illinois common law, so his complaint will go forward.

\*    \*    \*

To recap: Gruner is not collaterally estopped by the prior arbitration because the issues addressed there are either not identical to the issues raised by his current complaint or were not essential to the arbitrator's judgment. Gruner, moreover, adequately states a claim for relief under the ISL and Illinois common law because the ISL provides a remedy for sellers and because Gruner adequately alleged that Huron made misrepresentations of material fact. For these reasons, both Consilio's and Huron's motions to dismiss are denied.

Date: August 12, 2019

John J. Tharp, Jr.
United States District Judge